2025 IL App (2d) 230431
No. 2-23-0431
Opinion filed March 4, 2025

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| ILLINOIS GAMING MACHINE OPERATORS ASSOCIATION; J&J VENTURES GAMING, LLC; ACCEL ENTERTAINMENT GAMING, LLC; ILLINOIS GAMING SYSTEMS, LLC; VELASQUEZ GAMING, LLC; GAMING & ENTERTAINMENT MANAGEMENT-ILLINOIS LLC; EUREKA ENTERTAINMENT, LLC, d/b/a Universal Gaming Group; and SPARROW GAMING, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 20-CH-514 |
| THE CITY OF WAUKEGAN, | ) ) | Honorable Daniel L. Jasica, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices McLaren and Mullen concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiffs, Illinois Gaming Machine Operators Association (IGMOA); J&J Ventures Gaming, LLC (J&J); Accel Entertainment Gaming, LLC (Accel); Illinois Gaming Systems, LLC (Illinois Gaming Systems); Velasquez Gaming, LLC (Velasquez); Gaming & Entertainment Management-Illinois LLC (Gaming & Entertainment Management); Eureka Entertainment, LLC,

doing business as Universal Gaming Group (Eureka Entertainment); and Sparrow Gaming, Inc. (Sparrow), challenged an ordinance enacted by defendant, the City of Waukegan (City), that imposed on players of video gaming terminals (VGTs) a tax of one penny per push (push tax). The trial court dismissed two counts of plaintiffs' amended complaint and granted the City summary judgment on two counts. Plaintiffs appeal, arguing that the trial court erred in (1) dismissing, for failure to state a claim (735 ILCS 5/2-615 (West 2022)), their count alleging that the push tax is an unauthorized occupation tax (Ill. Const. 1970, art. VII, § 6(e)) (count I); (2) dismissing, for failure to state a claim, their count alleging that the push tax is a license for revenue (*id.*) (count II); (3) granting summary judgment in the City's favor on their uniformity clause count (Ill. Const. 1970, art. IX, § 2) (count VI); (4) granting summary judgment in the City's favor on their count alleging that the City exceeded its home rule powers (Ill. Const. 1970, art. VII, § 6(a)) (count VII); and (5) dismissing, for lack of a justiciable controversy (735 ILCS 5/2-619(a)(9) (West 2022)), their declaratory-judgment count (count VIII). For the following reasons, we affirm.

¶ 2                                I. BACKGROUND

¶ 3                                A. The Parties

¶ 4     IGMOA is a trade association composed of businesses that share the goal of promoting video gaming in Illinois. In their complaint, plaintiffs alleged that IGMOA "is dedicated to educating legislators and the public regarding responsible video gaming[ ] and the significant benefits video gaming brings to communities throughout Illinois." IGMOA's members include J&J, Accel, Illinois Gaming Systems, Velasquez, and Gaming & Entertainment Management, which, in their capacity as terminal operators licensed by the Illinois Gaming Board (Board), own and display VGTs for play or operation by the public within Waukegan. Eureka Entertainment and Sparrow are not members of IGMOA, but as licensed terminal operators they own and display

VGTs for play or operation by the public in Waukegan. Plaintiffs operate at licensed establishments within Waukegan and are subject to the push tax: J&J operates at 28 licensed establishments; Accel operates at 6; Illinois Gaming Systems operates at 2; Velasquez operates at 2; Gaming & Entertainment Management operates at 4; Eureka Entertainment operates at 2; and Sparrow operates at 1.

¶ 5    The City is a home rule unit of local government.

¶ 6                                B. Statutory Background

¶ 7    "There is no common-law right in Illinois to engage in or profit from gambling." *J&J Ventures Gaming, LLC v. Wild, Inc.*, 2016 IL 119870, ¶ 26. In 2009, the legislature enacted the Video Gaming Act (Act) (230 ILCS 40/27 (West 2022)), authorizing video gaming at various establishments in the state and authorizing municipalities to prohibit, by ordinance or resolution, video gaming.

> "The Act, which legalized the use of [VGTs] under certain limited circumstances, is an exception to the general prohibition against gambling. 230 ILCS 40/1 *et seq.* (West 2014). Consequently, gambling on [VGTs] is permitted in Illinois only as authorized by the Act, and gaming contracts that do not conform to the applicable regulatory requirements are void." *J&J Ventures Gaming, LLC*, 2016 IL 119870, ¶ 26.

¶ 8    The Act imposes a 30% base tax on net terminal income (NTI), which is defined as "money put into a [VGT[1]] minus credits paid out to players." 230 ILCS 40/5, 60(a) (West 2022). Five-

---

[1]The Act defines a VGT as:

> "any electronic video game machine that, upon insertion of cash, electronic cards or vouchers, or any combination thereof, is available to play or simulate the play of a video

sixths of this 30% tax (*i.e.*, 25% of NTI) is deposited into the Capital Projects Fund, and the remaining one-sixth is deposited into the Local Government Video Gaming Distributive Fund. *Id.* § 60(a). (Beginning July 1, 2019, an additional tax of 3% was imposed on NTI; beginning July 1, 2020, an additional tax of 1% was imposed on NTI (*id.* § 60(b)); and beginning on July 1, 2024, an additional tax of 1% was imposed on NTI (Pub. Act 103-592 (eff. June 7, 2024) (amending 230 ILCS 40/60(b))). These additional taxes are deposited into the Capital Projects Fund. 230 ILCS 40/60(b) (West 2022). Monies deposited into the Local Government Video Gaming Distributive Fund are allocated, among municipalities and counties that have not prohibited video gaming, in proportion to the video gaming tax revenue generated within each eligible municipality or county compared to the video gaming tax revenue generated statewide. *Id.* § 75(a). Half of the after-tax profits from a VGT are paid to the terminal operator, and half are paid to the licensed establishment. *Id.* § 25(c) (further providing that a terminal operator that violates one or more requirements of the subsection is guilty of a Class 4 felony and is subject to termination of its license). A terminal operator who falsely reports or fails to report NTI is guilty of a Class 4 felony and is subject to termination of its license. *Id.* § 60(e).

¶ 9     The Illinois Gambling Act (230 ILCS 10/1 *et seq.* (West 2022)) applies to the Act, except where they conflict, in which case the Illinois Gambling Act prevails. 230 ILCS 40/80 (West 2022). The legislative intent of the Illinois Gambling Act is to assist economic development,

---

game, including but not limited to video poker, line up, and blackjack, as authorized by the Board utilizing a video display and microprocessors in which the player may receive free games or credits that can be redeemed for cash. The term does not include a machine that directly dispenses coins, cash, or tokens or is for amusement purposes only." 230 ILCS 40/5 (West 2022).

promote tourism, increase available revenues to assist and support education, and defray State expenses. 230 ILCS 10/2(a) (West 2022).

¶ 10    Effective December 17, 2021, the Act provides that a home rule municipality may not impose any type of tax on terminal operators, VGTs, or users or players of VGTs. 230 ILCS 40/90(c) (West 2022) (further expressly providing that the provision "is a denial and limitation of home rule powers and functions"). However, it also provides that, as of that date, any home rule municipality that has imposed an amusement tax on persons participating in the playing of VGTs before November 1, 2021, may continue to impose such tax but cannot increase or expand it. *Id.* § 90(d) (further providing that the provision limits home rule powers and functions).

¶ 11                              C. Push Tax Ordinance

¶ 12    On April 9, 2020, the City enacted ordinance No. 20-O-28 (Ordinance), which amended the City's ordinances relating to the licensing of video gaming. City of Waukegan Ordinance No. 20-O-28 (approved Apr. 9, 2020) (codified at City of Waukegan Code of Ordinances §§ 3-75 through 3-96, as amended by City of Waukegan Ordinance No. 22-O-219 (approved Nov. 21, 2022) (amending, in pertinent part, City of Waukegan Code of Ordinances §§ 3-75 through 3-76A)). As relevant here, effective July 1, 2020, the Ordinance imposes upon any person participating in the playing of a VGT[2] in the City a push tax of one cent per play. City of Waukegan Code of Ordinances § 3-95(a) (approved Apr. 9, 2020). "Play" is defined as "each individual push of the [VGT] which initiates the simulation provided by the [VGT]. Play shall not include the

_____

[2]In the Ordinance, a VGT is ascribed its meaning in the Act but is broadened to include any machine that dispenses coins or tokens, etc., but excludes an automatic amusement machine. See City of Waukegan Code of Ordinances § 3-75 (approved Nov. 21, 2022).

physical pushing of individual wager amounts, selection types of the games on the terminal or the entry of any information or printing of winning receipts." City of Waukegan Code of Ordinances § 3-75 (approved Nov. 21, 2022). The Ordinance requires every VGT terminal operator to apply to register as a tax collector (City of Waukegan Code of Ordinances § 3-95(c) (approved Apr. 9, 2020)) and imposes a "joint and several duty o[n] any terminal operator and licensed establishment to secure, from each person participating in the play of a [VGT]," the push tax (*id.* § 3-95(d)). It also requires every terminal operator to remit to the City, on or before the twentieth day of the month following the month in which the push tax payment was made, push tax payments and tax returns. *Id.* § 3-95(d)(1). The Ordinance provides that a terminal operator's failure to collect the push tax does not excuse or release the player from the obligation to pay the tax and that the ultimate responsibility to pay the push tax remains on the player "and shall never be shifted to the terminal operator." *Id.* § 3-95(d)(2).

¶ 13    The Ordinance imposes upon the terminal operator a fine and suspension or revocation for cause of a terminal operator license for any false reports and for failures to report the amount of the push tax. *Id.* § 3-95(f)(a)(i) (further imposing a 5% monthly penalty, compounded monthly, on unpaid balances for late payments). The Ordinance is also deemed violated when a terminal operator or player knowingly furnishes false or inaccurate information to the City. *Id.* § 3-95(f)(a)(ii). A terminal operator violating the Ordinance is subject to a fine of $500 for a first offense, $750 for a second offense, and $1,000 and a mandatory revocation of its license to operate a VGT for a third offense. *Id.* § 3-95(f)(a)(iv). The City may bring an enforcement action against any person obligated to pay the push tax or any terminal operator for failing to remit the tax. *Id.* § 3-95(f)(b). Finally, the VGTs are subject to seizure for violations of the push tax. *Id.* § 3-96.

¶ 14                                    D. Initial Complaint

¶ 15    On August 20, 2020, plaintiffs filed a complaint for declaratory and injunctive relief (735 ILCS 5/2-701 (West 2022)), seeking a declaration that the Ordinance violated the uniformity clause of the Illinois Constitution and an injunction that would enjoin the City from applying and enforcing the push tax and any amounts due and owing as a result of the push tax, including any fines and penalties. Specifically, they alleged that the push tax is (1) an unconstitutional occupation tax because its practical effect is to tax terminal operators without statutory authority (count I), (2) an impermissible license for revenue because the City relies on its police power to raise revenue (count II), (3) violative of the due process clauses of the federal and state constitutions because it is impermissibly vague (count III), (4) violative of the equal protection clauses of the federal and state constitutions because the City does not impose a similar tax on operators of automatic amusement machines within the City (count IV), and (5) violative of the uniformity clause of the state constitution because the City does not impose a similar tax on operators of automatic amusement machines within the City (count V).

¶ 16    As relevant here, in count I, plaintiffs alleged that the push tax is an unauthorized occupation tax because it falls within the definition of NTI, which encompasses monies a player puts into a VGT. However, under the Act, the monies cannot be diverted to the City, as all of the monies must be distributed to the Board, the terminal operator, and the establishment. 230 ILCS 40/25, 60 (West 2022). They also argued that the VGT software and design do not allow a player to pay the tax, the terminal operators cannot change the software or design, and, even if allowed, it is technically complicated and cost prohibitive.

¶ 17    In count II, plaintiffs alleged that the push tax is an impermissible license for revenue. The legislature, they asserted, did not grant power to home rule units to use their police power to raise

revenue. They argued that the City relies on its police power to raise revenue through the push tax, making the push tax an impermissible license for revenue.

¶ 18                                    E. City's Motion to Dismiss Initial Complaint

¶ 19    On October 9, 2020, the City moved to dismiss plaintiffs' complaint (735 ILCS 5/2-619.1 (West 2022)), arguing that plaintiffs lacked standing (*id.* § 2-619(a)(9)) and, alternatively, that their complaint did not state claims of constitutional violations (*id.* § 2-615). It argued that plaintiffs lacked standing to challenge the ordinance, because terminal operators are not player-taxpayers upon whom the tax is imposed. The City also contended that plaintiffs, as terminal operators, could calculate and report the amount of push tax owed to the City each month and, thus, could not assert any injury. Specifically, the City noted that the Act required that VGTs have the capacity to display game histories for the most recent game and 10 games prior; that they have nonresettable meters that keep permanent records of the cash inserted into the machine, credits played, and credits won; and that such information be stored for 180 days. 230 ILCS 40/15(8), (11)-(12) (West 2022). Also, terminal operators must report and submit NTI to the State 15 days after the fifteenth day of each month and 15 days after the end of each month. *Id.* § 60(e). The City further argued that IGMOA did not suffer any direct injury or have associational standing to challenge the ordinance.

¶ 20    Addressing plaintiffs' individual claims relevant here, the City also argued, as to count I, that the push tax is not an occupation tax, asserting that it does not regulate or control any occupation but implements a flat amusement tax on players for their privilege to participate in playing VGTs. Alternatively, the City argued that, even if the push tax is an occupation tax, it is authorized under section 8-11-6a(7) of the Illinois Municipal Code (65 ILCS 5/8-11-6a(7) (West 2022) (allowing home rule municipalities to impose "other taxes not based on the selling or

purchase price or gross receipts from the use, sale or purchase of tangible personal property")). Addressing count II, it argued that the push tax is not a license for revenue, because any exercise of police powers under the Ordinance merely ensures compliance with the tax reporting process.

¶ 21                     F. Trial Court's December 23, 2020, Ruling (Counts I and II)

¶ 22    On December 23, 2020, the trial court dismissed with prejudice counts I and II and dismissed without prejudice count III. It also denied the City's motion to dismiss counts IV and V and rejected the City's standing argument. First, it found as to the individual terminal operators' standing that, because they alleged that they will be unable to pass on the tax to players at the time of play, they sufficiently asserted a distinct and palpable injury directly traceable to the tax that can be remedied by a declaration that the Ordinance is unconstitutional or enjoining its enforcement. Second, as to IGMOA's standing, the court found that it had met all three elements of and thus established associational standing, where the individual terminal operators, at least five of which are members of the IGMOA, established their standing, the ordinance impacts terminal operators' revenue and imposes recordkeeping and reporting requirements, which is germane to the interests and purpose of IGMOA, and no individual member would be required to participate in the litigation because declaratory and injunctive relief were sought.

¶ 23    Next, as to count I, the occupation-tax count, the court found that, even if the push tax was an occupation tax, the legislature authorized, under section 8-11-6a(7) of the Illinois Municipal Code, certain types of occupation taxes that would encompass the tax here. Accordingly, it dismissed count I, with prejudice.

¶ 24    Next, addressing count II, the license-for-revenue count, the court found that plaintiffs' arguments failed because the push tax was not a police power enactment but an enactment pursuant to the City's taxing powers under section 8-11-6a(7) of the Illinois Municipal Code. Further, the

obligation that plaintiffs maintain records and the potential subjection to civil fines and enforcement actions for noncompliance were insufficient to convert the push tax to a license for revenue. The court dismissed count II, with prejudice.

¶ 25                                     G. Amended Complaint

¶ 26     On February 1, 2021, plaintiffs filed an amended complaint that realleged and incorporated counts I (occupation tax) and II (license for revenue) for preservation for appeal; repleaded count III with additional allegations (due process vagueness); added an equal protection claim on the basis that the City was treating licensed establishments differently from terminal operators under the push tax (new count V); restyled the uniformity-clause claim as count VI; added a claim that, assuming the Ordinance required terminal operators to collect the push tax through VGTs, it violated article VII, section 6(a), of the Illinois Constitution (count VII); and a claim seeking several declarations, including that the Ordinance's plain language did not require terminal operators to collect the push tax through VGTs (count VIII).

¶ 27     As relevant here, plaintiffs alleged as to count VI that the push tax violates the uniformity clause because it does not tax persons playing similar devices, such as automatic amusement machines, and that there is no rational basis for the wholly arbitrary distinction between terminal operators and the operators of automatic amusement machines. In count VII, plaintiffs alleged that the push tax violates article VII, section 6(a), of the Illinois Constitution (Ill. Const. 1970, art. VII, § 6(a)), arguing that the City does not have home rule authority to impose requirements on terminal operators as to what occurs to the monies inserted into a VGT that is being operated under the auspices of the Act. Finally, in count VIII, plaintiffs sought a judgment declaring that a terminal operator could comply with the collection requirement by collecting the push tax through methods not involving VGTs, such as using a receptacle for players to deposit monies owed under the tax;

a terminal operator is not required to comply with the collection requirement by exclusively collecting through VGTs; it is not required to pay the City, at its own expense, any difference between the monies that it was able to collect from players for the push tax and the actual amount owed by players under the tax; and, if the terminal operator elects to collect the push tax through methods not involving VGTs, it could comply with the Ordinance by submitting tax returns that contain the number of plays during the relevant tax period based on monies that the terminal operator was able to collect during the same period, as compared to the actual number of plays that occurred.

¶ 28                    H. City's Motion to Dismiss Amended Complaint

¶ 29    On March 5, 2021, the City moved to dismiss plaintiffs' amended complaint, arguing that (1) the terminal operators did not have standing and IGMOA lacked associational standing to challenge the ordinance; (2) alternatively, the court lacked subject-matter jurisdiction due to plaintiffs' failure to name the Board as a defendant, where plaintiffs pleaded that Board approval was needed relative to the installation or reprogramming of software in VGTs to permit players to pay the tax and to track the pushes or plays per VGT (735 ILCS 5/2-619(a)(1) (West 2022)); (3) alternatively, count VIII should be dismissed for lack of a justiciable controversy, where the amended complaint did not allege a dispute between the parties concerning whether terminal operators could fulfill their collection and reporting obligations under the Ordinance through methods not involving VGTs and noting that prior to filing the complaint plaintiffs' counsel e-mailed the City's counsel to seek confirmation of the City's position relative to their receptacle proposal (*id.* § 2-619(a)(9)); and (4) alternatively, the remaining counts (counts III through VII) failed to state a claim for which relief could be granted (*id.* § 2-615).

¶ 30                         I. Trial Court's May 7, 2021, Order

¶ 31    On May 7, 2021, the trial court dismissed without prejudice count III (due process vagueness), dismissed with prejudice count IV (equal protection), dismissed with prejudice count V (equal protection), denied dismissal of count VI, denied dismissal of count VII, and dismissed without prejudice count VIII (declaratory judgment). It also denied the motion to dismiss with respect to standing. Plaintiffs did not replead count III or VIII. As relevant here, the court found that the declaratory judgment count was duplicative of plaintiffs' section 6(a) claim, where plaintiffs' allegation established that the push tax could be collected outside VGTs and that the Ordinance was silent as to the collection method.

¶ 32    On July 9, 2021, the City filed an answer to plaintiffs' amended complaint. On October 6, 2021, the City denied a request to admit as to whether it was the City's position that the Ordinance required collection of the push tax through VGTs. It admitted that the Ordinance had no requirement for collection through VGTs. Further, in Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2018) disclosures, the City identified two alderpersons and a project analyst expected to testify that the Ordinance was enacted to provide revenue to promote the general health, safety, and welfare of the City and its residents and to provide adequate funds to offset the adverse effects of gambling that occur in the City. On February 2, 2022, the City issued to terminal operators, including plaintiffs, notices of a deficiency between the amount that terminal operators were able to collect from players through receptacles that were placed outside of VGTs and the amounts owed by players. The notices stated that the returns were incomplete and delinquent; that "filing an incomplete return may have negative consequences such as late fee assessments, negative

license standing with the City, and possible license suspension up to and including revocation"[3]; and that terminal operators should contact the City to resolve the issue.

¶ 33                                    J. Summary Judgment Motions

¶ 34    On March 11, 2022, the City moved for summary judgment on counts VI (uniformity clause) and VII (home rule powers) of the amended complaint, and plaintiffs moved for summary judgment on count VII of the amended complaint. As to count VI, the City noted that, in answers to interrogatories, it had supplied evidence of the Ordinance's purpose. Specifically, the Ordinance was enacted to provide revenue to promote the general health, safety, and welfare of the City and its residents and to provide adequate funds to offset the adverse effects of gambling that occurs within the City. The Ordinance, it argued, does not violate the uniformity clause, because there is a reasonable relationship between the taxation of VGTs and the Ordinance's objective.[4] It noted that it had identified three witnesses—two aldermen and a project analyst—who were expected to testify. Next, addressing count VII, the City argued that the Ordinance does not require terminal operators to collect the push tax through VGTs; what happens to the monies in the VGTs is a matter related to local government and affairs, notwithstanding any extensive regulation by the State; and, in light of recent legislation legalizing push taxes where home rule municipalities have enacted ordinances before November 1, 2021 (102nd Ill. Gen. Assem., House Bill 3136, 2021

---

[3]The notice also stated that "[l]ate [f]ees due will be invoiced to you moving forward." There is no indication in the record that late fees were ever assessed against plaintiffs.

[4]The City noted that the trial court had already addressed another prong of the uniformity analysis—specifically, whether the classification is based on a real and substantial difference between the people taxed and those not taxed—and found that automatic amusement devices differ from VGTs, as the latter constitute gambling.

Sess.; Pub. Act 102-689 (eff. Dec. 17, 2021) (adding 230 ILCS 40/90)), plaintiffs could not argue that the regulation of money inserted into VGTs is a traditional, exclusive State function.

¶ 35     In plaintiffs' motion, plaintiffs sought summary judgment on count VII of their amended complaint, arguing that the City's requirement that terminal operators collect the push tax from players through VGTs is unconstitutional as a clear violation of the Act and the Illinois Constitution.

¶ 36                    K. Trial Court's May 18, 2022, Order (Counts VI and VII)

¶ 37     On May 18, 2022, the trial court granted the City summary judgment on counts VI and VII, entered final judgment in the City's favor, and denied plaintiffs' summary judgment motion. Addressing count VI (uniformity clause), the court first reaffirmed its finding that there is a real and substantial difference between an automatic amusement device and a VGT, as only the latter holds the prospect of financial remuneration as an important goal and component of the player experience. Second, as to whether the tax classification bears some reasonable relationship to the object of the legislation or public policy, the court found that plaintiffs did not meet their burden to show that the facts did not support the City's justification for the classification or that the stated purpose was insufficient as a matter of law. Permitting a casino or authorizing additional VGTs, the court found, does not serve as an admission that gambling in general and VGTs in particular cause no negative impacts on the community. Further, the court found that differing tax treatment between automatic amusement devices and VGTs is not unreasonable, as one form of entertainment is gambling and the other is not and gambling is subject to far greater regulation and oversight. Accordingly, the court granted the City summary judgment on count VI of the amended complaint.

¶ 38    Next, addressing count VII, the court determined that the City did not exceed its home rule authority. It noted that plaintiffs did not dispute that the City has express statutory authority to prohibit, license, and tax VGTs; rather, they argued only that the *manner* in which the Ordinance requires the push tax to be collected and remitted to the City exceeds the City's home rule authority, because it mandates that the tax be collected through the VGT itself and not from the player, terminal operator, or licensed establishment outside of the VGT. The court further noted that plaintiffs argued that the legislature has a vital interest in controlling NTI and exercises a traditionally exclusive role in collecting, allocating, and distributing NTI. It found that the Ordinance does not expressly preclude payment or collection through other means, such as placing a separate push tax collection receptacle next to each VGT, and noted that plaintiffs admitted as much in their amended complaint. Regardless, the court further found that there was no indication of a legislative intent to preempt the recovery of local taxes through VGTs. The new legislation, the court noted, evinced an express intent to permit the City's push tax to be enforced. "On its face, this appears an express legislative recognition and validation of the City's Push Tax Ordinance." The legislature, the court determined, intended to allow the City to continue to impose the push tax. If the legislature knew that the Ordinance required the push tax to be recovered exclusively through VGTs, it neither expressed opposition to this requirement nor limited the manner in which the tax could be collected (although it could have done so). The court determined that the legislature's intent "was to recognize pre-existing push tax ordinances while limiting more widespread adoption of such ordinances" and to permit concurrent State and home rule municipal regulation. "If the only permissible manner to collect the City's push tax is through the VGTs, then that is presumably what the Legislature authorized. It would make no sense for the Legislature to express approval of the City's push tax but then prohibit the only means of collecting that tax."

¶ 39                               L. Initial Appeal (Count VIII)

¶ 40     On June 16, 2022, plaintiffs filed a notice of appeal from the trial court's December 23, 2020, May 7, 2021, and May 18, 2022, orders. The appeal was docketed in this court as case No. 2-22-0220, and, on July 25, 2023, this court dismissed the appeal for lack of jurisdiction because the trial court's rulings on counts III and VIII were not final. *Illinois Gaming Machine Operators Ass'n v. City of Waukegan*, No. 2-22-0220 (2023) (unpublished summary order under Illinois Supreme Court Rule 23(c)). The mandate issued on September 5, 2023, and, on September 7, 2023, plaintiffs filed in the trial court an unopposed motion for the entry of a final order dismissing counts III and VIII, with prejudice, to allow them to appeal any of the counts. On September 27, 2023, the trial court granted the motion and entered an order dismissing both counts with prejudice. Plaintiffs now appeal the trial court's December 23, 2020, May 7, 2021, May 18, 2022, and September 27, 2023, orders.

¶ 41                               II. ANALYSIS

¶ 42     Plaintiffs argue that the trial court erred in (1) dismissing, for failure to state a claim, count I of the initial and amended complaint (occupation tax); (2) dismissing, for failure to state a claim, count II of the initial and amended complaint (license for revenue); (3) granting summary judgment in the City's favor on count VI of the amended complaint (uniformity clause); (4) granting summary judgment in the City's favor on count VII of the amended complaint (home rule powers); and (5) dismissing, for lack of a justiciable controversy, count VIII of the amended complaint (declaratory judgment). For the following reasons, we affirm.

¶ 43                               A. Preliminary Matters

¶ 44                               1. Judicial Notice

¶ 45    Initially, we address two preliminary matters. First, we turn to plaintiffs' motion for judicial notice. During briefing in this case, plaintiffs moved, on May 2, 2024, for this court to take judicial notice of certain public records. Specifically, they noted that the trial court dismissed count VIII (declaratory judgment) because it found there was no justiciable controversy between the parties as to whether the City requires terminal operators to collect the push tax from players through the VGTs. In February 2022, plaintiffs further noted, the City issued to terminal operators notices of deficiencies between the money the terminal operators were able to collect from players through receptacles that were placed outside of VGTs and the amounts owed by players. Plaintiffs further alleged that, since the termination of the trial court proceedings, the City, as part of its ongoing enforcement efforts, issued to terminal operators, including plaintiffs, a first round of notices of hearings, alleging violations of the Ordinance and seeking to impose penalties. Plaintiffs attached copies of a sampling of violation notices, along with motions to dismiss or stay the proceedings filed by some terminal operators, including some plaintiffs. Plaintiffs asked this court to take judicial notice of the City's violation notices and the terminal operators' motions. They argued that the records were relevant to whether a live controversy exists between the parties regarding the City's tax collection methods and asserted that, notwithstanding the Ordinance's failure to specify a collection method, the City was allegedly requiring terminal operators to collect the tax through VGTs. The violation notices and the motions to dismiss or stay are part of the administrative record for the ongoing tax hearings, they noted, and thus, their consideration would result in no unfair surprise or prejudice to the City. Finally, they noted that the City objected to the motion.

¶ 46   On May 13, 2024, this court granted plaintiffs' motion, subject to reconsideration. We noted that, if plaintiffs improperly relied on the records in their opening brief, the City may so argue in its appellee's brief.

¶ 47   In its appellee's brief, the City argues that plaintiffs' reliance on evidence of the City's ongoing enforcement efforts is irrelevant and moot because plaintiffs did not timely ask the trial court to stay enforcement of the judgment pursuant to Illinois Supreme Court Rule 305(b) (eff. July 1, 2017) (stays of judgments pending appeal). It asserts that plaintiffs seek to use judicial notice to address discrete ongoing administrative matters without previously having sought a stay or appending motions, which would necessitate ripeness as well as separate and independent examinations. It notes that plaintiffs supplement the record with about 300 pages, introducing new materials that include new motions, briefs, arguments, affidavits, letters, e-mails, push-tax records, and news articles that sidestep procedural and evidentiary rules. This additional evidence, the City contends, does not fall within the category of readily verifiable facts. Also, it asserts that, in their brief, plaintiffs ambiguously cite the materials without specific page cites. To the extent plaintiffs demand general review and judicial consideration of the briefs appended to their motion, the City argues, it impermissibly expands arguments germane to this appeal, developing arguments not preserved at the trial level.

¶ 48   Addressing count VIII (declaratory judgment) in their reply brief, plaintiffs assert that this court can take judicial notice of other litigation and should take judicial notice of the 2024 enforcement proceedings in considering whether the trial court erred in accepting, over their well-pleaded allegations, the City's representations in a brief that the City did not have issues with the terminal operators' reporting and collection obligations.

¶ 49     "It is well settled that public documents that are included in the records of other courts and administrative tribunals may be the subject of judicial notice." *NBD Highland Park Bank, N.A. v. Wien*, 251 Ill. App. 3d 512, 520 (1993); see Ill. R. Evid. 201(b) (eff. Jan. 1, 2011) (court may take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); *Village of Riverwoods v. BG Ltd. Partnership*, 276 Ill. App. 3d 720, 724 (1995) (noting that "[j]udicial notice is proper where the document in question is part of the public record and where such notice will aid in the efficient disposition of a case"). However, "[a] court will not take judicial notice of critical evidentiary material not presented in the court below or of evidence that may be significant in the proper determination of the issues between the parties." *Cook County Board of Review v. Property Tax Appeal Board*, 339 Ill. App. 3d 529, 541-42 (2002).

¶ 50     Upon reconsideration, we deny plaintiffs' motion for judicial notice. First, as the City notes, plaintiffs provide no page citations of the 300 pages of materials of which they request that we take judicial notice. See Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) (requiring the argument section of the appellant's brief to cite the "pages of the record relied on"). Second, we decline to take judicial notice of the 2024 enforcement proceedings, because they are ongoing. Third, even if we considered the 2024 enforcement proceedings, we would factor in that plaintiffs misrepresent the nature of the deficiency notices, as the notices do not reflect that the City is requiring the terminal operators to collect the push tax through VGTs. The notices of hearing allege merely that the terminal operators failed to collect and remit the push tax and/or failed to register as a terminal operator.

¶ 51                                    2. Standing

¶ 52    Next, the City asserts that, pursuant to section 2-619 of the Code, dismissal of plaintiffs' amended complaint was warranted for lack of standing. It acknowledges that the trial court rejected its standing argument but asserts that this court can examine the issue anew because a reviewing court may sustain a decision of the trial court on any grounds called for by the record, regardless of whether the trial court made its decision on the proper ground. The City notes that it asserted lack of standing in two rounds of motions to dismiss and in its answer to plaintiffs' amended complaint and contends that our resolution would be dispositive. The City did not file a cross-appeal, but it argues that, even though a reviewing court is generally confined to the appellant's issues, the standing issue should be addressed because it serves no purpose to cross-appeal to preserve conditional arguments such as standing.

¶ 53    Plaintiffs respond that the City cannot appeal the standing issue and, even if it can, they have standing. Plaintiffs also note that the City did not cross-appeal the trial court's order denying its motions to dismiss for lack of standing, and they argue that the City cannot now improperly attempt to backdoor a cross-appeal. They assert that, by not filing a cross-appeal, the City waived its right to this challenge and may not appeal the denial of its motions to dismiss, because the final judgment was in its favor.

¶ 54    A reviewing court may affirm the judgment on any grounds called for by the record, regardless of whether the trial court made its decision on the proper ground. *Landmarks Preservation Council of Illinois v. City of Chicago*, 125 Ill. 2d 164, 174-75 (1988). "[F]indings of the circuit court adverse to the appellee do not require that the appellee cross-appeal if the judgment of the circuit court was not, at least in part, against him." *Id.* (holding that, although the defendants filed a cross-appeal, they were not required to do so to bring the standing issue before the reviewing court); see *People ex rel. Vuagniaux v. City of Edwardsville*, 284 Ill. App. 3d 407, 415-16 (1996)

(holding that the appellee's standing argument was properly before the court, where the appellee did not file a cross-appeal but was "an entirely successful litigant in the court below"; thus, the appellee's argument that the appellants did not have standing "does not seek the reversal or modification of the judgment as entered in the trial court"; rather, the "claim is akin to an alternate argument, directed against a possible modification of the judgment by" the reviewing court). Here, although the City was unsuccessful in obtaining a dismissal of plaintiff's amended complaint on the basis of standing, the trial court ultimately entered judgment in the City's favor. Accordingly, the City was not required to file a cross-appeal to preserve the standing issue. *Hampton v. Cashmore*, 265 Ill. App. 3d 23, 26 (1994) (dismissing as improperly filed the appellees' cross-appeal from denial of motion to dismiss, where no part of court's final judgment was adverse to the appellees, but noting that the appellees' issues could be reviewed because an appellee may advance any argument supported by the record to sustain trial court's judgment).

¶ 55    Turning to the merits of the standing issue, the City argues that (1) terminal operators are not within the taxpaying class and, thus, they do not allege a distinct and palpable injury to them by the Ordinance and (2) IGMOA does not meet the associational standing requirements.

¶ 56    A party has standing to bring a claim only when that party has a real interest in the outcome of the controversy. *Chicago Teachers Union, Local 1 v. Board of Education of Chicago*, 189 Ill. 2d 200, 206 (2000); see *Hill v. Butler*, 107 Ill. App. 3d 721, 725 (1982) ("The concept of standing to bring suit requires that parties before the court seeking relief have a sufficiently protectable interest pursuant to statute or common law which is alleged to be injured."). A self-proclaimed concern about a matter of public interest does not grant standing, no matter how sincere. *Landmarks Preservation Council of Illinois*, 125 Ill. 2d at 175; *Lombard Historical Comm'n v. Village of Lombard*, 366 Ill. App. 3d 715, 717 (2006). However, members of the public have a

protectable interest in ensuring that public officials follow the requirements of public statutes. *Lombard Historical Comm'n*, 366 Ill. App. 3d at 718; *Hill*, 107 Ill. App. 3d at 725.

¶ 57 Lack of standing is an affirmative defense. *Lombard Historical Comm'n*, 366 Ill. App. 3d at 718; *Hill*, 107 Ill. App. 3d at 725; *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 494 (1988). Accordingly, a plaintiff need not allege facts establishing standing; rather, it is the defendant's burden to plead and prove lack of standing. *Chicago Teachers Union, Local 1*, 189 Ill. 2d at 206. "Standing is a question of law that we review *de novo*." *Davis v. Yenchko*, 2024 IL 129751, ¶ 16.

" 'The purpose of the doctrine of standing is to ensure that courts are deciding actual, specific controversies, and not abstract questions or moot issues.' *In re Marriage of Rodriguez*, 131 Ill. 2d 273, 279-80 (1989). 'In deciding whether a party has standing, a court must look at the party to see if he or she will be benefitted by the relief granted.' *Id.* at 280. In Illinois, '[s]tanding requires some injury in fact to a legally recognized interest.' *Glazewski v. Coronet Insurance Co.*, 108 Ill. 2d 243, 254 (1985). That injury may be ' "actual or threatened," [citation],' but it 'must be: (1) "distinct and palpable" [citation]; (2) "fairly traceable" to the defendant's actions [citation]; and (3) substantially likely to be prevented or redressed by the grant of the requested relief [citation].' *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 492-93 (1988).

'Moreover, in the context of an action for declaratory relief, there must be an actual controversy between adverse parties, and the party requesting the declaration must possess some personal claim, status or right that is capable of being affected by the grant of such relief.' *Glisson*[ *v. City of Marion*], 188 Ill. 2d [211,] 221 (1999). An ' "actual controversy' " is a ' " 'concrete dispute *** , the resolution of which will aid in the

termination of the controversy or some part thereof.' " ' *Cahokia Unit School District No. 187*[ *v. Pritzker*], 2021 IL 126212, ¶ 36 (quoting *The Carle Foundation v. Cunningham Township*, 2017 IL 120427, ¶ 26, quoting *Underground Contractors Ass'n v. City of Chicago*, 66 Ill. 2d 371, 375 (1977))." *Id.* ¶¶ 17-18.

¶ 58                                (a) Terminal Operator Standing

¶ 59    The City argues that the terminal operators do not allege a distinct and palpable injury to them by the Ordinance. Rather, the Ordinance's plain terms provide that the terminal operators facilitate collection from the paying players. The City maintains that the party who directly pays an allegedly invalid charge or tax has standing to challenge the charge or tax. Here, it asserts, the terminal operators lack standing to sue, because they do not incur the push tax's economic burden. The Ordinance provides that the failure of the terminal operator to collect the push tax does not excuse the player from the obligation to pay the push tax. The City argues that, as tax collectors, the terminal operators do not pay the push tax in whole or in part. Nor are any penalties assessed against them for their failure to *collect or remit* the push tax; instead, terminal operators violate the ordinance if they fail to *report* or if they *falsely report* the tax owed. Reporting and collection objectives, the City asserts, do not accord terminal operators standing to challenge the Ordinance.

¶ 60    Plaintiffs respond that the terminal operators have standing. They note that the trial court rejected the City's argument, where plaintiffs had alleged that they will be unable to pass on the tax to players at the time they play VGTs and, thus, will suffer a distinct and palpable injury directly traceable to the Ordinance that can be remedied by the court declaring the Ordinance unconstitutional or enjoining its enforcement. Plaintiffs also note that the Ordinance imposes fines, penalties, and interest on terminal operators, which courts have construed, they argue, to cause the

tax collector to remain liable for the taxes if the patron does not pay. See *Chicago Health Clubs, Inc. v. Picur*, 124 Ill. 2d 1, 10 (1988).

¶ 61    In rejecting the City's argument, the trial court found that, because the terminal operators alleged that they will be unable to pass on the push tax to players at the time they play the VGTs, the terminal operators will suffer a distinct and palpable injury (loss of revenue) directly traceable to the Ordinance that can be remedied by the court declaring the Ordinance unconstitutional or enjoining its enforcement.

¶ 62    We conclude that the terminal operators have standing. Although the Ordinance provides that the push tax is imposed upon players and the obligation always remains on the players, many of the Ordinance's penalties are assessed against terminal operators. The Ordinance imposes fines and suspension or revocation of terminal operator licenses for false reports or failures to report the amount of the tax (City of Waukegan Code of Ordinances § 3-95(f)(a)(i),(iv) (approved Apr. 9, 2020)); the City may bring an enforcement action against terminal operators (*id.* § 3-95(f)(b)); and the VGTs are subject to seizure for violations of the push tax (*id.* § 3-96). Thus, clearly, the terminal operators bear an economic burden (along with a recordkeeping-type and reporting one) that is not insignificant and that is traceable to the City's action in enacting the Ordinance and substantially likely to be redressed by the grant of the relief that is requested here.

¶ 63                                (b) Associational Standing

¶ 64    Next, the City argues that the IGMOA does not have associational standing, because its members lack standing to otherwise sue in their own right, the interests on appeal are not germane to IGMOA's purpose, and the case requires the participation of individual IGMOA members—as best demonstrated by the inclusion of several IGMOA members as plaintiffs.

¶ 65    An association may have standing to sue on behalf of its members where " '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.' " *Illinois Road & Transportation Builders Ass'n v. County of Cook*, 2022 IL 127126, ¶ 14 (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).

¶ 66    The City first argues that IGMOA members lack standing to otherwise sue in their own right, relying on its arguments above, which we rejected. Next, it contends that the second and third requirements for associational standing are not met, because plaintiffs' allegations are conclusory. The City argues that IGMOA's bare statements that interests it seeks to protect are germane to its organizational purpose and that individual members are dispensable to the case are, without more, insufficient to establish associational standing. IGMOA has asserted, it notes, that its organizational purpose is to educate about responsible video gambling and the societal benefits of video gaming. However, the City continues, IGMOA's participation in this suit renders its role—purportedly on behalf of its terminal operator members—peripheral and ambiguous. Because it is comprised of more than five terminal operators (also manufacturers, distributors, suppliers, beverage establishment owners, and "other parties"), its participation, the City asserts, becomes increasingly tenuous.

¶ 67    Finally, it contends that this case requires the participation of individual IGMOA members, as shown by the inclusion of several IGMOA members as plaintiffs. The City contends that, to the extent that IGMOA's membership consists primarily of entities other than its five terminal operators, it cannot show its necessary purpose for associational standing. It pleaded that it had at least five terminal operator members subject to the Ordinance (with one having 28 VGTs and

others having as few as 2 VGTs in Waukegan), all of whom are individual plaintiffs, and thwarting its contention that its individual members are dispensable to this case. Also, there are non-IGMOA member plaintiffs bringing this action, the City argues, further negating the notion that IGMOA has any industry stake in this case. The pleadings establish that the five plaintiff members have unique interests necessitating their separate individual participation. The City also notes that IGMOA has not alleged that any IGMOA terminal operator is unable to afford the costs of challenging the action on its own and, because the association has no responsibility over the push tax, it lacks a recognizable interest in this dispute about tax constitutionality.

¶ 68　Plaintiffs respond that the trial court properly found that IGMOA has associational standing. First, they contend that its individual members have standing, which we addressed above. Second, they note the court's finding that IGMOA includes terminal operators and other members with vested interests in the future of video gaming in Illinois and, thus, the Ordinance's impacts on video gaming are germane to the interests and purpose of IGMOA. Plaintiffs reason that this refutes the City's arguments concerning non-terminal-operator members and that its statement that IGMOA's governing principles and documents are absent from the record ignores that it is not plaintiffs' burden to establish standing. Third, plaintiffs also assert that, contrary to the City's argument, the participation of certain members as plaintiffs does not render IGMOA's participation dispensable and that the City is improperly shifting the burden to plaintiffs to allege that a terminal operator is unable to afford the costs of challenging the action, which is not an element of associational standing. The IGMOA can secure relief for all of its members, plaintiffs argue, including those less well-resourced, and avoid the judicial burden of numerous lawsuits.

¶ 69　We resolved, above, the first prong of associational standing in IGMOA's favor. Turning to the second prong, the germaneness test is undemanding and requires merely a " 'pertinence

between [the] litigation subject and organizational purpose.' " *Sunnyside Elgin Apartments, LLC v. Miller*, 2021 IL App (2d) 200614, ¶ 32 (quoting *Humane Society of the United States v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988)). " 'An association's litigation interests must be truly unrelated to its organizational objectives before a court will declare that those interests are not germane.' *American Insurance Ass'n v. Selby*, 624 F. Supp. 267, 271 (D.D.C. 1985)." *Deerpath Consolidated Neighborhood Ass'n v. Lake County Board of Review*, 2021 IL App (2d) 190985, ¶ 20. We conclude that this prong is met here. IGMOA's purpose is to educate about responsible video gambling and the societal benefits of video gaming. The Ordinance clearly impacts video gaming in the City, and, thus, the litigation is not "truly unrelated" to its objectives. Finally, as to the third prong—that neither the claim asserted nor the relief requested require the participation of individual members in the lawsuit—we conclude that it is met. The third prong is " 'judicially fashioned and prudentially imposed,' " and it is a matter of " 'administrative convenience and efficiency.' " *International Union of Operating Engineers, Local 148 v. Illinois Department of Employment Security*, 215 Ill. 2d 37, 48 (2005) (quoting *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 557-58 (1996)). Resolution of the issues here does not require us to assess the individual circumstances of each plaintiff. See *id.* at 52 (holding that third prong was met where union's suit did not require consideration of aggrieved union members' individual circumstances and action raised legal questions of whether members were eligible to receive benefits and were of the same grade or class as members of other union).

¶ 70                                    B. Standard of Review

¶ 71      A motion to dismiss brought under section 2-615 of the Code of Civil Procedure challenges the legal sufficiency of a complaint based on defects apparent on its face. *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009). A cause of action should not be dismissed

pursuant to a section 2-615 motion unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to relief. *Id.* In ruling on such a motion, only those facts apparent from the face of the pleadings, matters of which the court can take judicial notice, and judicial admissions in the record may be considered. *Id.* We accept as true all well-pleaded facts and all reasonable inferences that may be drawn from those facts. *Id.* However, a plaintiff may not rely on mere conclusions of law or facts unsupported by specific factual allegations. *Id.* We review *de novo* an order granting a section 2-615 motion to dismiss. *Id.*

¶ 72    A section 2-619 motion to dismiss admits the legal sufficiency of the complaint. 735 ILCS 5/2-619 (West 2022). The purpose of a section 2-619 motion to dismiss is to dispose of issues of law and easily proved issues of fact at the outset of the litigation. *In re Estate of Gallagher*, 383 Ill. App. 3d 901, 903 (2008). Although a section 2-619 motion to dismiss admits the legal sufficiency of a complaint, it raises defects, defenses, or some other affirmative matter appearing on the face of the complaint or established by external submissions that defeat the plaintiff's claim. *Ball v. County of Cook*, 385 Ill. App. 3d 103, 107 (2008). Specifically, section 2-619(a)(9) permits involuntary dismissal where "the claim asserted against [the] defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2022). An affirmative matter is something in the nature of a defense that negates the cause of action completely. *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 486 (1994). We review *de novo* a section 2-619 dismissal. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 368 (2003).

¶ 73    A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2022). The trial court must view these documents and exhibits in the light

most favorable to the nonmoving party. *Midwest Gaming & Entertainment, LLC v. County of Cook*, 2015 IL App (1st) 142786, ¶ 46. If reasonable people would draw divergent inferences from undisputed facts, summary judgment is inappropriate. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). Summary judgment is a drastic measure and should be granted only if the movant's right to judgment is clear and free from doubt. *Stasko v. City of Chicago*, 2013 IL App (1st) 120265, ¶ 31. Mere speculation, conjecture, or guess, however, is insufficient to withstand summary judgment. *Illinois Coin Machine Operators Ass'n v. County of Cook*, 2015 IL App (1st) 150547, ¶ 31. The party moving for summary judgment bears the initial burden of proof. *Id.* The purpose of summary judgment is not to try an issue of fact but to determine whether a triable issue of fact exists. *Pedersen v. Village of Hoffman Estates*, 2014 IL App (1st) 123402, ¶ 27. We review *de novo* an appeal from a summary judgment ruling. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004).

¶ 74                          C. Count I—Occupation Tax—Section 2-615

¶ 75    Plaintiffs argue first that the trial court erred in dismissing count I, the unauthorized-occupation-tax-count, for failure to state a claim. The trial court found that, even assuming that the push tax qualified as an occupation tax, it was authorized by section 8-11-6a(7) of the Illinois Municipal Code. Plaintiffs contend that the court erred in finding that the Illinois Municipal Code expressly authorizes the push tax and that it erred when it declined to find that the tax constitutes an occupation tax prohibited by the Illinois Constitution. Finally, they argue that recent amendments to the Act expressly preempt home rule occupation taxes on terminal operators and warrant reversal of the court's ruling. For the following reasons, we find plaintiffs' claim unavailing.

"Under the Illinois Constitution, '[a] home rule unit shall have only the power that the General Assembly may provide by law *** (2) to license for revenue or impose taxes upon or measured by income or earnings or upon occupations.' Ill. Const. 1970, art. VII, § 6(e). '[A]lthough section 6(e) permits taxes upon the sale or use of tangible items, the taxation of commercial services constitutes an "occupation tax" which is prohibited unless sanctioned by the legislature.' *Communications & Cable of Chicago, Inc. v. Department of Revenue*, 275 Ill. App. 3d 680, 685 (1995) (citing *Commercial National Bank v. City of Chicago*, 89 Ill. 2d 45 (1982)). The term 'upon occupations' was not defined by the framers of the Constitution. *Paper Supply Co. v. City of Chicago*, 57 Ill. 2d 553, 565 (1974). However, our supreme court has stated that ' "an occupation tax has one of two missions: either to regulate and control a given business or occupation, or to impose a tax for the privilege of exercising, undertaking or operating a given occupation, trade or profession." ' *Town of Cicero v. Fox Valley Trotting Club, Inc.*, 65 Ill. 2d 10, 23 (1976) (quoting *Reif v. Barrett*, 355 Ill. 104, 109 (1933))." *Accel Entertainment Gaming, LLC v. Village of Elmwood Park*, 2015 IL App (1st) 143822, ¶ 54.

¶ 76    Factors to be considered in determining if an ordinance imposes a tax "upon occupations" are whether it (1) "regulates and controls a given occupation"; (2) "imposes a tax for the privilege of engaging in a given occupation, trade[,] or profession"; or (3) "imposes a tax on the privilege of engaging in the business of selling services." *Illinois Gasoline Dealers Ass'n v. City of Chicago*, 119 Ill. 2d 391, 399 (1988). In determining whether a particular tax has been imposed upon an occupation or provider of services, courts look at the following factors: (1) who bears the responsibility for collecting and remitting the tax to the city (*Picur*, 124 Ill. 2d at 9-12), (2) whether the provider of services is responsible for payment of the tax regardless of whether the patrons pay

the tax (*Commercial National Bank of Chicago v. City of Chicago*, 89 Ill. 2d 45, 66-67 (1982)), and (3) whether the provider of services is subject to penalties for nonpayment of the subject tax (*Waukegan Community Unit School District No. 60 v. City of Waukegan*, 95 Ill. 2d 244, 255 (1983)). "A simple declaration by the home rule body that a given tax is imposed on the purchaser of services is not sufficient to avoid the restrictions imposed by the constitution." *Communications & Cable of Chicago, Inc. v. City of Chicago*, 282 Ill. App. 3d 1038, 1044 (1996).

> "Rather, it is the practical operation of the ordinance that determines where the legal incidence of the tax falls and therefore the nature of the tax. [Citation.] Accordingly, the practical effect of the entire ordinance must be examined in determining whether or not the tax imposed by the ordinance falls within the proscription of section 6(e) of article VII." *Id.*

¶ 77 Plaintiffs argue that the push tax is an occupation tax because its practical effect is to impose a tax on the terminal operators' privilege of doing business and providing video gaming services in the City. According to plaintiffs, the terminal operators bear the responsibility for collecting and remitting the tax to the City, the City allegedly enforces the tax such that the terminal operators are responsible for paying the tax regardless of whether the player pays the tax, and the terminal operators are subject to penalties for nonpayment of the tax. See *Picur*, 124 Ill. 2d at 10 ("[A]lthough the tax may ostensibly fall on individuals receiving the clubs' services, the tax truly is an 'occupation' tax within the meaning of section 6(e) [of article VII, of the Illinois Constitution]. The clubs are not only responsible for collecting and remitting the tax to the city, but are also responsible for paying the tax to the city regardless of whether their patrons fail or refuse to remit the tax. Additionally, the health clubs are subject to some very substantial penalties for any delays in submitting the tax payments." (Emphasis omitted.)).

¶ 78    The City responds that the Ordinance provides that the push tax is imposed on the privilege of simulated play on a VGT within Waukegan's boundaries and that the legislature contemplated such home rule ordinances with "amusement tax[es] on persons who participate in the playing" of VGTs. 230 ILCS 40/90(d) (West 2022). Relying on case law holding that amusement taxes are not occupation taxes, the City argues that the Ordinance does not impose a tax upon the occupation itself of being a terminal operator and notes that the case law involved ordinances, such as here, where the owners collected and remitted the taxes at issue. See *Kerasotes Rialto Theater Corp. v. City of Peoria*, 77 Ill. 2d 491, 500-01 (1979) (a tax on admission to amusement is not an occupation tax); *Town of Cicero v. Fox Valley Trotting Club, Inc.*, 65 Ill. 2d 10, 21-24 (1976) (tax on all amusements in city was not limited to occupations, as the term is commonly used to mean profit-motivated, ongoing concerns and, thus, was not an occupation tax); *DeWoskin v. Loew's Chicago Cinema, Inc.*, 306 Ill. App. 3d 504, 514-17 (1999) (amusement tax on tickets not an occupation tax on movie theaters). Thus, the City contends that a tax on participating in the playing of video games, like one on participating in an amusement, is not a tax upon occupations under the Illinois Constitution. It also argues that the fact that the terminal operators must collect and remit the push tax does not render it an occupation tax.

¶ 79    We conclude that the push tax is not an occupation tax. We reject plaintiffs' argument that the practical operation and effect of the push tax is like the tax in *Picur*, in that the provider remains liable to pay the tax if the patron fails or refuses to pay it. Here, the Ordinance unambiguously provides that a terminal operator's failure to collect the push tax does *not* excuse or release the player from the obligation to pay the tax and the ultimate obligation for the push tax remains on the player "and shall never be shifted to the terminal operator." City of Waukegan Code of Ordinances § 3-95(d)(2) (approved Apr. 9, 2020). Further, the City may bring an enforcement

action against any person obligated to pay the tax. *Id.* § 3-95(f)(b). Terminal operators face fines and suspension/revocation of their licenses for false reporting or failures to report the tax, they are subject to enforcement actions by the City for failing to remit the tax, and their VGTs are subject to seizure for violations of the push tax (*id.* §§ 3-95(f)(a)(i), (ii), (iv), (f)(b), 3-96). However, these penalties are triggered by reporting and remitting failures and are not the substantive equivalent of liability for payment of the push tax. Again, the ultimate responsibility to pay the tax is on the player. *Id.* § 3-95(d)(2). This distinguishes this case from *Picur* and warrants a different conclusion. *Cf. DeWoskin*, 306 Ill. App. 3d at 516 ("[w]hile the Ordinance in this case requires amusement providers to act as tax collectors and imposes penalties in the event that they fail to do so, it does not make the providers liable for unpaid taxes and specifically states that '[t]he failure of the tax collector to collect the tax shall not excuse or release the patron from the obligation to pay the tax.' "). Further, the Ordinance does not impose liability on terminal operators for payment of the push tax regardless of whether the players pay the tax. There is no such language in the enactment.

¶ 80    Finally, plaintiffs claim that, at a hearing on its motion to dismiss plaintiffs' initial complaint, the City responded that the terminal operators were liable for the push tax if they failed to collect the push tax from players.[5] Plaintiffs argue that this response reflects that the City seeks to impose *liability* on terminal operators for tax that players failed or refused to pay. We reject this argument because it mischaracterizes the City's position at the hearing. The question was phrased

---

[5]Specifically, the court inquired: "if the gaming terminal operator does not, for whatever reason, charge the one cent tax, does it still owe the [City] a penny?" The City answered: "Correct. If you sell gas and you don't *collect* it from your—if you sell gas and don't *collect* the gas tax, guess what? You're still responsible for it." (Emphases added.)

in terms of the failure to *collect or charge* the tax and made no reference to players who either failed or refused to *pay* it. The *collection* obligation is on the terminal operators, and liability to *pay* the push tax is on the players. Regardless, the City's position was not that the terminal operator was required to pay the tax itself but that it remained responsible to collect it. Relatedly, we reject plaintiffs' argument that it is impossible to collect the tax because they are legally and technologically prohibited from collecting it from monies inserted into the VGTs. This argument is premised on an inaccurate reading of the unambiguous Ordinance, which nowhere dictates that the tax must be collected through the VGTs; it nowhere specifies a collection method.

¶ 81    In sum, the trial court did not err in dismissing count I for failing to state an occupation tax claim.

¶ 82                    D. Count II—License for Revenue—Section 2-615

¶ 83    Plaintiffs argue next that the trial court erred in dismissing, for failure to state a claim, count II, the license-for-revenue count, where it found that the push tax was not a police power enactment but one pursuant to the City's taxing powers under section 8-11-6a(7) of the Illinois Municipal Code. Plaintiffs assert that the Illinois Municipal Code does not authorize the City to impose the push tax and that the tax is expressly preempted by section 90 of the Act.

¶ 84    The City responds that the Ordinance is a taxing measure, not a license for revenue. The legislature, it contends, authorized the push tax via section 8-11-6a(7) of the Illinois Municipal Code, which provides that home rule municipalities may impose taxes that are "not based on the selling or purchase price or gross receipts from the use, sale or purchase of tangible personal property." 65 ILCS 5/8-11-6a(7) (West 2022). It also argues that the use of police powers to enforce an ordinance does not mean a municipality enacted a measure to produce revenue through those powers.

¶ 85    The Illinois Constitution provides that "[a] home rule unit shall have only the power that the General Assembly may provide by law *** (2) to license for revenue or impose taxes upon or measured by income or earnings or upon occupations." Ill. Const. 1970, art. VII, § 6(e). Our supreme court has explained that " '[t]he phrase "to license for revenue" describes those situations in which a governmental unit that did not have the power to tax attempted to raise revenue by the exercise of its police power.' " *Paper Supply Co. v. City of Chicago*, 57 Ill. 2d 553, 576 (1974) (quoting *Rozner v. Korshak*, 55 Ill. 2d 430, 433 (1973)).

¶ 86    Section 8-11-6a(7) of the Illinois Municipal Code authorizes the push tax. It prohibits (*i.e.*, does not "authori[ze]") certain home rule taxes, such as "a retailer's occupation tax, service occupation tax, use tax, sales tax or other tax on the use, sale or purchase of tangible personal property based on the gross receipts from such sales or the selling or purchase price of said tangible personal property." 65 ILCS 5/8-11-6a (West 2022). However, it does not preempt a home rule entity's "other taxes not based on the selling or purchase price or gross receipts from the use, sale or purchase of tangible personal property." *Id.* § 8-11-6a(7). Thus, the Illinois Municipal Code permits home rule taxes not based on the selling price or gross receipts from personal property use. Courts have consistently held that municipal taxes similar to the push tax are permissible under section 8-11-6a(7) and nearly identical statutes. See, *e.g.*, *Accel Entertainment Gaming*, 2015 IL App (1st) 143822, ¶¶ 54-62 (holding that, even if fees  required by an ordinance for the licensing of VGTs was an occupation tax, plain language of section 8-11-6a(7) of the Illinois Municipal Code permitted the tax, where village's license fee was not based on the selling or purchase price or gross receipts from the use, sale, or purchase of tangible personal property); *Midwest Gaming*, 2015 IL App (1st) 142786, ¶¶ 77-89 (holding that, even if home rule county's tax on owners of gambling machines, including VGTs, was an occupation tax, it was authorized by section 5-1009

of the Counties Code (55 ILCS 5/5-1009 (West 2012)) (which is identical in all material respects to section 8-11-6a of the Illinois Municipal Code) and that subsection (7) (*id.* § 5-1009(7); see 65 ILCS 5/8-11-6a(7) (West 2012)) permits the tax because it was not based on the selling or purchase price or gross receipts from the use, sale, or purchase of tangible personal property); *American Beverage Ass'n v. City of Chicago*, 404 Ill. App. 3d 682, 690 (2010) (city's five-cent-per-water-bottle tax held permissible under section 8-11-6a(7) because subsection (7) excepted the bottled water tax from preemption, "as it is a flat tax of five cents per bottle and is not based on the selling or purchase price or gross receipts from the use, sale or purchase of tangible personal property"). We follow these cases, as they are analytically sound, and we reject plaintiffs' argument that they were wrongly decided because they failed to acknowledge the distinction between "authority" and "preemption." We agree with the City that this distinction is not substantive enough to warrant a different outcome. The statute itself uses both terms interchangeably. 65 ILCS 5/8-11-6a (West 2022) (home rule municipality does not have "authority" to impose a tax on use, sale or purchase of tangible personal property based on receipts from sales but is not "preempt[ed]" from imposing other taxes not based on selling or purchase price or gross receipts from the use, sale, or purchase of tangible personal property).

¶ 87    Further, the push tax is not a license for revenue, because the exercise of the City's police power under the Ordinance merely ensures compliance with the enactment. See, *e.g.*, *Midwest Gaming*, 2015 IL App (1st) 142786, ¶¶ 95-97 (reversed summary judgment for the plaintiff casino owner; holding that "registering, affixing an emblem, and labeling a gambling machine; maintaining records of transactions; and making the premises available for inspection" did not convert the county plaintiff's gambling machine tax into a license for revenue; enforcement provisions, including penalties and fines, only confirm that tax is paid and do not regulate; "the

police power is only used for instances of noncompliance"); *Jacobs v. City of Chicago*, 53 Ill. 2d 421, 424-25 (1973) (parking tax ordinance that was adopted under home rule powers and required parking facility operators to collect tax and remit it to city and subjected operators to suspension or revocation of license for willful failures to pay tax was not a license for revenue; tax was not upon the operator, provided that liability for tax was borne by person occupying parking space, duty of collecting and remitting tax made operator an agent of city for purposes of collecting the tax, and penalties did not convert collection system into license for revenue; penalties were merely provisions to insure collection procedures' integrity).

¶ 88     We further conclude that section 90(c) of the Act, effective as of December 17, 2021, does not preempt the push tax, and we disagree with plaintiffs' argument that section 90(d) does not apply to save it, because the push tax is not an "amusement tax." 230 ILCS 40/90(c)-(d) (West 2022) (prohibiting a municipality from imposing any tax upon a terminal operator, VGT, or player of a VGT but allowing home rule municipalities with amusement tax ordinances adopted before November 1, 2021, on persons playing VGTs to continue to impose such tax). Neither the Act nor the Illinois Gambling Act define "amusement tax," and plaintiffs offer no definition. Section 90 addresses VGTs, which are gambling devices, and the taxes that may be imposed on them. This inclusion necessarily means that an amusement tax is one that can be imposed on a VGT, including the push tax. Plaintiffs merely point to the fact that "Amusements" fall under a different chapter of the City's code than VGTs and that the Ordinance provides that a VGT does not include an automatic amusement machine. These aspects of the Ordinance provide no guidance to interpreting section 90 of the Act. As section 90(d) grandfathers the push tax, section 90(c)'s prohibition/preemption of home rule taxes upon terminal operators, VGTs, or VGT players does not apply.

¶ 89 In sum, the trial court did not err in dismissing count II, the license-for-revenue count, for failure to state a claim.

¶ 90                     E. Count VI—Uniformity Clause—Summary Judgment

¶ 91 Next, plaintiffs argue that the trial court erred in granting the City summary judgment on count VI, the uniformity-clause count. The uniformity clause provides that, "[i]n any law classifying the subjects or objects of non-property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly. Exemptions, deductions, credits, refunds and other allowances shall be reasonable." Ill. Const. 1970, art. IX, § 2. "Generally, to survive scrutiny, a nonproperty tax classification must (1) be based on a real and substantial difference between the people taxed and those not taxed and (2) bear some reasonable relationship to the object of the legislation or to public policy." *Guns Save Life, Inc. v. Ali*, 2021 IL 126014, ¶ 20.

¶ 92 Plaintiffs do not challenge the trial court's finding on the first prong. As to the second prong, our assessment "is typically a narrow inquiry. While a municipality must 'produce a justification' for its classification, we normally uphold a taxing classification as long as 'a set of facts "can be reasonably conceived that would sustain it." ' ' " *Id.* ¶ 21 (quoting *Empress Casino Joliet Corp. v. Giannoulias*, 231 Ill. 2d 62, 73 (2008), quoting *Geja's Cafe v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 248 (1992)). Once the municipality produces a justification, the plaintiff then has the burden to persuade the court that the explanation is insufficient as a matter of law or unsupported by the facts. *Id.*

¶ 93 The trial court found that there is a real and substantial difference between an automatic amusement device and a VGT, as only the latter holds the prospect of financial remuneration as an important goal and component of the player experience. Second, as to whether the classification

bears some reasonable relationship to the object of the legislation or to public policy, the court found that plaintiffs did not meet their burden to show that the facts did not support the City's justification or that the stated purpose was insufficient as a matter of law. Permitting a casino or authorizing additional VGTs does not serve as an admission that gambling in general and VGTs in particular cause no negative impacts on the community, the court determined. Further, the court found, differing tax treatment between automatic amusement devices and VGTs is not unreasonable, as one form of entertainment is gambling and the other is not and gambling is subject to far greater regulation and oversight.

¶ 94     Plaintiffs argue that the City failed to satisfy its initial burden of producing a justification for the push tax and notes that the trial court acknowledged that the Ordinance is silent regarding the tax's purpose. The City, plaintiffs further assert, provided no factual basis to support the object of the Ordinance at the summary judgment stage, and the court, they contend, erroneously granted summary judgment to the City based on the City's conclusory statement that the Ordinance promotes the general health, safety, and welfare of the City and its residents and provides funds to offset the adverse effects of gambling. The City, plaintiffs also assert, did not include an affidavit from any of its officials addressing the alleged adverse effects of gambling on the City. Plaintiffs contend that they presented evidence refuting the City's alleged justification for the tax— specifically, that the City increased the maximum number of VGTs per establishment, is building a casino, and indicated that the tax would be used to fund pensions and capital improvements. They also maintain that the City disclosed its witnesses after the close of discovery, without any affidavits or deposition testimony.

¶ 95     The City responds that, as to the second prong, the taxing body bears the initial burden of producing a justification for the taxing classification but that it bore no evidentiary burden in

justifying the tax (although it did provide a justification in the form of sworn interrogatory answers). Further, once it supplied a justification, it contends, it became plaintiffs' burden to prove that the justification was unsupported by facts or insufficient as a matter of law. The City further argues that it did not need to do anything more and that plaintiffs failed to contradict that justification. It became plaintiffs' burden to come forward with evidentiary facts, not just speculation, the City argues, to show that the asserted justification was unsupported or arbitrary, and plaintiffs failed to satisfy their burden. The City contends that it timely disclosed its witnesses, who could have testified further about the Ordinance's objective, but plaintiffs did not depose them to marshal evidence to support their claim that the Ordinance was enacted to raise revenue to address the ill effects of gambling.

¶ 96    The City further contends that, because there is no fundamental right at issue, it did not need to meet a higher burden, establishing a "closer tie" between the tax classification and the object of the Ordinance. Rather, it asserts, the standard analysis of whether a reasonable relationship exists between the classification and the object of the legislation applies. Such a reasonable relationship, it urges, exists here. Plaintiffs cannot now complain that they lacked a record to oppose summary judgment, when they were dilatory in pursuing the relevant discovery.

¶ 97    The City is correct as to its burden:

> "[The plaintiff] cites no cases in which this court has held that a taxing body bears an evidentiary burden in justifying the tax in a uniformity challenge. Rather, the above-cited cases demonstrate that the taxing body need only assert a justification for the classification. It is the plaintiff who then has the evidentiary burden of proving that the asserted justification is unsupported by the facts. The more rigorous standard of reasonableness in uniformity analysis simply allows the plaintiff to mount a good-faith uniformity challenge

without having the initial burden of disproving every conceivable explanation for the tax. The ultimate burden remains with the plaintiff, however, to demonstrate that the taxing body's asserted justification is unsupported by the facts or insufficient as a matter of law. To hold otherwise would undermine the well-settled principle that a statute bears a strong presumption of constitutionality and that the party challenging the statute has the burden of demonstrating the statute's unconstitutionality." (Emphasis omitted.) *Arangold Corp. v. Zehnder*, 204 Ill. 2d 142, 156-57 (2003).

¶ 98 We conclude that the trial court did not err in granting the City summary judgment on the uniformity-clause count. The City asserted a justification for the Ordinance—specifically, to provide revenue to promote the general health, safety, and welfare of Waukegan and its residents and to provide adequate funds to offset the adverse effects of gambling that occurs within Waukegan. We agree with the City that its actions to increase the number of VGTs per establishment and planning for a large casino do not negate (or raise a factual question concerning) evidence that it combatted the adverse effects of gambling in the municipality. The City's position (and its justification for the Ordinance) is not that it seeks to eliminate gambling; rather, its position acknowledges a negative effect of the activity and the action it took to combat it. Further, as it contends, plaintiffs' allegations concerning IGMOA's purpose—to educate about responsible video gambling and the societal benefits of video gaming—tacitly concede that irresponsible gaming occurs. Plaintiffs did not raise a material factual issue as to this count. A reasonable relationship exists here between the classification and the object of the legislation applied. Plaintiffs failed to satisfy their burden to show that the asserted justification was unsupported or arbitrary.

¶ 99    In sum, the trial court did not err in granting the City summary judgment on count VI, the uniformity-clause count.

¶ 100        F. Count VII—Section 6(a) Home Rule Powers—Summary Judgment

¶ 101    Plaintiffs next argue that the trial court erred in granting summary judgment in the City's favor on count VII—the home-rule-powers count. We disagree.

¶ 102    Both parties moved for summary judgment on count VII. When all parties file cross-motions for summary judgment, the court is invited to decide the issues presented as questions of law. *Mr. B's, Inc. v. City of Chicago*, 302 Ill. App. 3d 930, 933 (1998). Our review remains *de novo*. *Empress Casino Joliet Corp.*, 231 Ill. 2d at 69.

¶ 103    In count VII, plaintiffs alleged that the push tax's collection mechanism through VGTs (*to the extent the City insisted that the Ordinance imposes a collection requirement in this way, rather than through other means*) did not pertain to the City's government and affairs, as required by article VII, section 6(a) of the Illinois Constitution, and that the City could not exercise implied authority in its stead. The State, they alleged, has an interest and traditionally exclusive role in regulating monies collected through VGTs and how those monies are distributed (specifically, the Act dictates how NTI is distributed), which is related to its vital interest in preserving and regulating video gaming. The City does not have home rule authority to impose, they argued, requirements upon terminal operators as to what occurs to the monies inserted into a VGT, because the City's power does not extend into areas that do not pertain to its government and affairs. Thus, plaintiffs alleged, there is a conflict between the Ordinance and the Act, and a terminal operator cannot both collect the push tax from players through a VGT to satisfy the Ordinance and comply with the Act. In this way, they asserted, to the extent it requires collection through VGTs, the City is precluded from exercising its implied home rule powers with respect to collecting the push tax.

¶ 104   In granting summary judgment in the City's favor on this count, the trial court found that the City did not exceed its home rule authority. Plaintiffs' claim, the court determined, was based on a faulty premise that there is a distinction between a local government's authority to impose a tax versus its authority to dictate the manner of collection of that tax and that the collection of the push tax through VGTs is historically solely within the State's control and regulation. The court found that the Ordinance does *not* explicitly require the push tax to be collected through VGTs and it does not expressly preclude payment or collection through other means, such as placing separate push tax collection receptacles next to each VGT (and the court noted that plaintiffs admitted as much in their amended complaint). Further, the court noted that the City had represented to the court that separate receptacles for players to deposit monies would be an acceptable manner for the push tax to be collected. Thus, the court determined, if the push tax could be collected outside of VGTs, then count VII necessarily failed because plaintiffs challenged only the manner in which they contended the push tax was to be collected (*i.e.*, through VGTs).

¶ 105   Next, the court found that, *even if* the Ordinance required the push tax to be collected through VGTs, *City of Chicago v. StubHub, Inc.*, 2011 IL 111127, upon which plaintiffs relied, did not control. Plaintiffs, the court determined, could not establish a vital State interest, where the City has an interest in collecting its push tax and, as a recipient of NTI, the City also has an interest in the monies collected through VGTs. The trial court also distinguished *StubHub* on the basis that, in that case, the supreme court relied on evidence of a clear legislative intent; here, the court found, plaintiffs offered no such evidence. The trial court also noted that section 90 of the Act evinced the opposite of what plaintiffs argued—an express intent to *permit* the push tax to be enforced; this reflected a legislative intent to permit concurrent state and home rule municipal regulation.

¶ 106    Plaintiffs argue that the City requires terminal operators to collect the tax through VGTs, as evidenced by the fact that the Ordinance is patterned after the Village of Oak Lawn's push tax ordinance—which was allegedly developed on the premise that collection of the tax would be through VGTs—and by a newsletter by the Illinois Coalition of Local Governments—which states that VGTs can be programmed to record and collect the push tax. They also note that the City did not respond when plaintiffs informally e-mailed the City's counsel, asking for confirmation that a terminal operator can comply with the Ordinance's collection requirement only by collecting the push tax through VGTs. Further, plaintiffs argue, the City's enforcement actions speak for themselves, where, in February 2022, it issued notices to terminal operators of deficiencies between the monies they were able to collect from players through receptacles outside of VGTs and the amounts owed by players. Thus, plaintiffs argue, the trial court erred in finding that there was no basis for a section 6(a) challenge because there was no express requirement in the Ordinance that terminal operators collect the push tax through VGTs.

¶ 107    The City responds that the Ordinance does not require that terminal operators collect the push tax through VGTs. It argues that plaintiffs' extrinsic evidence did not surmount their previous pleadings acknowledging otherwise. There is no need, it argues, to look at extrinsic evidence, where the Ordinance does not mandate a collection method and where plaintiffs pleaded as much. Addressing the newsletter upon which plaintiffs rely, the City responds that it was not drafted by the City, nor does it establish that the City required the push tax to be collected through VGTs. Addressing plaintiffs' reliance on an e-mail from the City's finance director's—seeking adaptive guidance as to how the Village of Oak Lawn collects under its ordinance—the City argues that the e-mail does not show what the *City* dictated as a means of collection, nor does the City's nonresponse to plaintiff's January 15, 2021, informal e-mail—sent amid plaintiffs' August 2020

ongoing litigation. The Ordinance, the City urges, lacks any prescribed mechanism or methodology for collection and nothing at the trial level or on appeal shows otherwise.

¶ 108　We agree with the City that the Ordinance clearly does not mandate collection through VGTs, which is the *premise* of count VII, and that plaintiffs' pleadings acknowledged this. *Guns Save Life, Inc.*, 2021 IL 126014, ¶ 16 ("As with statutes, the best indicator of a municipality's intent is the language used in the ordinance, given its plain and ordinary meaning."). We also agree that the newsletter and informal e-mail upon which plaintiffs rely do not show otherwise or control over the language of the Ordinance. See *Platform I Shore, LLC v. Village of Lincolnwood*, 2014 IL App (1st) 133923, ¶ 14 (declining to consider extrinsic evidence where ordinance was unambiguous).

¶ 109　We further cannot conclude that the City's enforcement actions show that it requires collection of the push tax through VGTs. The letters nowhere reference how the tax must be collected. For example, in Velasquez's December 2021 terminal operator push tax return, Velasquez listed that there were 712,866 push plays for the period, the total tax due was $7,186.66, and the amount collected was $13.47. In response, the City, on February 2, 2022, informed Velasquez that the terminal operator was responsible for *collecting* the push tax and *remitting* it monthly to the City; that the City had determined that its return was incomplete and, thus, delinquent because $7,115.19 was filed but not paid; and that the consequences of filing an incomplete return included late fees, negative license standing, and possible license suspension/revocation. It instructed Velasquez to contact the City to resolve the account. (No subsequent history is contained in the record.) At this point, the City's response does not, we believe, place the burden of *paying* the tax on the terminal operators; rather, it highlights the lack of satisfactory *collection* (and the potential consequences as a result) and nothing more (and

certainly not enough to raise a factual question on the issue). Thus, plaintiffs' assertion that the City's actions reflect that it requires the push tax to be collected through VGTs is not well taken. The City is not forcing terminal operators to pay out of pocket, as plaintiffs maintain, the difference between what they can collect and what players owe. The Ordinance precludes this, as liability for the push tax always remains on the player, and the City's notices to plaintiffs did not reflect that the City requires terminal operators to pay the tax out of pocket.

¶ 110   In sum, the trial court did not err in granting summary judgment in the City's favor on count VII, the home-rule-powers count.

¶ 111                 G. Count VIII—Declaratory Judgment—Section 2-619

¶ 112   Plaintiffs' final argument is that the trial court erred in dismissing count VIII, the declaratory-judgment count.

¶ 113   Section 2-701(a) of the Code of Civil Procedure provides that a circuit court may, "in cases of actual controversy, make binding declarations of rights, having the force of final judgments," including "the construction of any *** contract or other written instrument, and a declaration of the rights of the parties interested." 735 ILCS 5/2-701(a) (West 2022). The declaratory judgment statute is "liberally construed and should not be restricted by unduly technical interpretations" (*First of America Bank, Rockford, N.A. v. Netsch*, 166 Ill. 2d 165, 174 (1995)), though its application must still comport with the general rule that "[c]ourts cannot pass judgment on mere abstract propositions of law, render advisory opinions, or give legal advice as to future events" (*Shipp v. County of Kankakee*, 345 Ill. App. 3d 250, 255 (2003)).

¶ 114   Declaratory relief is proper only if there is an actual legal controversy between the parties, *i.e.*, if there is "a concrete dispute admitting of an immediate and definitive determination of the parties' rights, the resolution of which will aid in the termination of the controversy or some part

thereof." *Underground Contractors Ass'n v. City of Chicago*, 66 Ill. 2d 371, 375 (1977). If the controversy is theoretical, rather than actual, then the claim is premature. *Adkins Energy, LLC v. Delta-T Corp.*, 347 Ill. App. 3d 373, 376 (2004). However, if the parties' rights are fixed, *i.e.*, if "the controversy has progressed so far that there is nothing left for [them] to do except file suit for damages or other consequential relief," then the claim has been brought too late; there may be a claim for damages, but a declaratory judgment is no longer proper. *Id.* This is because the purpose of a declaratory judgment is to allow the parties to a dispute to "learn the consequences of their action[s] before acting." (Internal quotation marks omitted.) *Beahringer v. Page*, 204 Ill. 2d 363, 372-73 (2003). There must be at least some future conduct that the declaration sought will guide.

¶ 115 In count VIII, plaintiffs sought a judgment declaring that (1) a terminal operator can comply with the collection requirement by collecting the push tax through methods not involving VGTs, such as using a receptacle for players to deposit monies owed under the tax; (2) a terminal operator is not required to comply with the collection requirement by exclusively collecting through VGTs; (3) a terminal operator is not required to pay the City, at its own expense, any difference between the monies that it was able to collect from players for the push tax and the actual amount owed by players under the tax; and (4) if the terminal operator elects to collect the push tax through methods not involving VGTs, it can comply with the Ordinance by submitting tax returns that contain the number of plays by players during the relevant tax period based on monies that the terminal operator was able to collect from the players during the same period.

¶ 116 In dismissing count VIII, the trial court found that the count was duplicative of count VII (home rule powers), in that, in both counts, plaintiffs sought a declaration that they need not collect the push tax through VGTs and could instead set up separate receptacles and pay the City what they collect. The City, the court noted, had not disputed that (or was silent regarding whether)

plaintiff could comply with the Ordinance's collection requirement by collecting the push tax through methods not involving VGTs. Thus, the court found that there was no real dispute and the relief sought was no different than that in count VII.

¶ 117    Plaintiffs first argue that count VIII is not duplicative of count VII. They contend that, in count VIII, they did not merely seek a declaration that the push tax could be collected outside of VGTs; they also sought a declaration that terminal operators did not have to make up the difference between what they collected from players and what players owed to the City, as well as that terminal operators could comply with the reporting requirements by including an estimation of the number of pushes based on the amount of tax collected from players, neither of which, they assert, overlap with the relief sought in count VII. Also, plaintiffs argue that count VII sought to invalidate the collection mechanism as unconstitutional pursuant to section 6(a) of the Illinois Constitution, while count VIII sought a declaration that terminal operators did not need to collect the tax through VGTs, because such a requirement does not exist in the Ordinance's plain language.

¶ 118    Plaintiffs argue second that the court relied solely on the City's arguments that there was no controversy. They note that they alleged in their amended complaint that they submitted tax returns, under protest, that explained that collection of the push tax could not be accomplished through VGTs (because it is prohibited by the Act and the Board's regulations and by the current state of VGT technology). Their returns did not include the number of pushes because they could not be accurately reported and any false reporting constituted a violation of the Ordinance. Plaintiffs also note that they alleged that the City had threatened enforcement, which, they argue, is sufficient to establish a live controversy. They also note that they alleged that they e-mailed the City to seek clarification of its position on their collection and reporting obligations under the

Ordinance and that the City had not responded.[6] Plaintiffs *acknowledge* that their questions to the City overlap with the four declarations they sought in count VIII, but they note that the City did not respond. They contend that, combined with the City's continued threats of future enforcement, this solidified the existence of an actual controversy between the parties. Finally, plaintiffs note that, during subsequent summary judgment proceedings, filings reflected that the City had issued deficiency notices to terminal operators in February 2022, taking issue with plaintiffs' attempts to collect the push tax through receptacles outside of VGTs (notifying terminal operators that there was a deficit between what they collected from players and the amount of tax owed and, thus, late fees and possible license suspensions were potential negative consequences). They also contend that, unlike terminal operators, players are not subject to any penalties or allegedly liable for violations under the Ordinance. The City, they contend, is holding terminal operators responsible for any difference in the amount collected outside of VGTs and what players owe, and a declaration is needed to resolve this.

¶ 119    The City responds that the count was properly dismissed because it did not establish an actual controversy, where the Ordinance does not dictate collection methods. It notes that plaintiffs themselves pleaded that there was no actual controversy, where they alleged that the Ordinance does not detail any specific requirements for how the push tax is collected and that it appeared to allow for collection through methods outside of a VGT. The City further notes that plaintiffs e-

---

[6]Specifically, they sought confirmation or denial that a terminal operator could comply with the collection requirement only by collecting the push tax through the VGTs; that the terminal operator was required to pay the City, at its own expense, any difference between the monies it collected and the actual amount owed by players; and that the terminal operator cannot comply with the Ordinance by submitting tax returns that contain the number of plays based upon the monies that it was able to collect from players.

mailed the City, seeking approval of their receptacle-method proposal (and appended the informal e-mail to their amended complaint). This e-mail, the City asserts, shows that the parties do not stand in a position adverse to one another. It also argues that the amended complaint does not show any concrete dispute over whether a terminal operator is required to pay any tax uncollected from players.

¶ 120 Further, the City contends that the amended complaint contains generic, conclusory statements to the effect that the City had mandated collection through VGTs. It asserts that the complaint lacks specific factual allegations concerning who from the City was involved in those interactions or when they allegedly occurred. Also, the allegations do not align with the Ordinance's language. The Act, the City notes, requires play history to be tracked. 230 ILCS 40/15(8) (West 2022) (providing that, at a minimum, VGTs "must have the capacity to display complete play history (outcome, intermediate play steps, credits available, bets placed, credits paid, and credits cashed out) for the most recent game played and 10 games prior thereto"). It also contends that there is no controversy concerning plaintiffs' desires to report only what they collect from players in receptacles as opposed to push play history stored on meters in the VGTs. The return form calls for a disclosure of the VGT's complete push play history. The City also asserts that, ultimately, the Ordinance prioritized a correct execution of tasks over methodological details and does not dictate how the tax is collected from players but requires only that the amount is accurate and aligned with the number of plays per each VGT. Also, total push plays is information about general VGT play history, not individual tracking.

¶ 121 We conclude that the trial court did not err in dismissing count VIII. Based on the record before us, we agree with the City that plaintiffs did not establish an actual controversy. The Ordinance requires terminal operators to register as tax collectors, to collect the push tax, and to

remit to the City, monthly, push tax payments and tax returns. It does not dictate *how* to collect the push tax. Further, the penalties to which terminal operators are subject are *not* dependent on, or triggered by, specific collection methods. Although terminal operators are subject to fines, penalties, and suspensions/revocations for cause of a terminal operator license for filing false reports or failing to report tax amounts and VGTs are subject to seizure for violations of the push tax requirements, ultimate liability for the tax remains on the players, and they are subject to enforcement actions. Further, as the City notes, in the amended complaint, plaintiffs alleged that the Ordinance "does not detail any specific requirements for how the Push Tax is collected" and that "it appears that based on the language of the Tax Ordinance a terminal operator could comply with the Tax Ordinance's collection requirements by collecting the Push Tax through methods not involving the VGT, including but not limited to using receptacles for players to deposit the monies owed for the Push Tax." Plaintiffs cannot avoid their pleadings. Further, they did not allege that the City imposed against them any fines, penalties, etc. It merely sent notices of deficiency that stated that their returns were incomplete and delinquent; that "filing an incomplete return may have negative consequences such as late fee assessments, negative license standing with the City, and possible license suspension up to and including revocation"; and that terminal operators should contact the City to resolve the issue. The City's communications merely noted the discrepancies and sought resolution. We do not believe that it is reasonable to infer from the communications that the City sought to preclude collection of the push tax from outside VGTs.

¶ 122    In sum, the trial court did not err in dismissing count VIII, the declaratory-judgment count.

¶ 123                                   III. CONCLUSION

¶ 124    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 125    Affirmed.

***Illinois Gaming Machine Operators Ass'n v. City of Waukegan*,
2025 IL App (2d) 230431**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 20-CH-514; the Hon. Daniel L. Jasica, Judge, presiding. |
| **Attorneys for Appellant:** | Kim R. Walberg, Richard Y. Hu, and Adam Decker, of Taft Stettinius & Hollister LLP, Michael Moody and Terrence Dunleavy, of O'Rourke & Moody, LLP, and Michael J. Kasper, of Kasper & Nottage P.C., all of Chicago, and Donald J. Morrison, of Kelleher + Holland, LLC, of Waukegan, for appellants. |
| **Attorneys for Appellee:** | Christian E. Ketter, Michael F. Carroll, and Paul A. O'Grady, of Peterson, Johnson & Murray, LLC, of Oak Brook, and Stewart J. Weiss, of Elrod Friedman LLP, of Chicago, for appellee. |